[Cite as *State v. Threats*, 2018-Ohio-3825.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

STEPHEN THREATS,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 18 JE 0003**

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 14-CR-82

**BEFORE:**
Kathleen Bartlett, Gene Donofrio, Cheryl L. Waite Judges.

---

**JUDGMENT:**
AFFIRMED

---

*Atty. Jane Hanlin*, 16001 State Route 7, Steubenville, Ohio 43952, for Plaintiff-Appellee
and

*Stephen Threats, Pro se*, #663-193, 5701 Burnett Road, P.O. Box 901, Leavittsburg,
Ohio 44430, for Defendant-Appellant.

Dated:  September 19, 2018

**BARTLETT, J.**

{¶1} Appellant Stephen Threats, acting *pro se*, appeals the judgment entry of the Jefferson County Court of Common Pleas overruling his post sentence motion to withdraw plea, pursuant to Crim.R. 32.1. Because Appellant has not demonstrated that a manifest injustice occurred in this case, the judgment entry of the trial court overruling the motion to withdraw plea is affirmed, albeit on other grounds.

I.     Facts and Procedural History

{¶2} Appellant pled guilty to and was convicted of one count of murder, in violation of R.C. 2902.02(A), an unclassified felony, with a firearms specification under R.C 2941.145, and one count of tampering with evidence, in violation of R.C. 2521.12(A)(1), a felony of the third degree.  Appellant was originally charged with aggravated murder, in violation of R.C. 2903.01(A), which requires prior calculation and design, but pled to the amended charge of murder pursuant to a plea agreement with the state.

{¶3} At the plea hearing, Appellant admitted to shooting the victim, Chad Taravella four or five times, taking the gun from the scene, and throwing it in the woods. The trial court imposed an aggregate indeterminate sentence of eighteen years in prison without the possibility of parole.  (12/18/14 J.E., p. 2).  We granted Appellant's motion to file a delayed direct appeal, but ultimately concluded that the trial court's failure to correctly impose postrelease control did not invalidate the plea.  Appellant's conviction and sentence were upheld, with the exception of that portion of the sentence imposing postrelease control, which was reversed and remanded for a new sentencing hearing and entry.  *State v. Threats*, 7th Dist. No. 15 JE 0005, 2016-Ohio-8478, 78 N.E.2d 211.

{¶4} According to the statement of the case in the direct appeal, Appellant, a resident of New Castle, Pennsylvania, was staying at the Jefferson County apartment of a friend, who provided the following testimony at the preliminary hearing:  Appellant and three others (two women and a man) went for a walk on May 14, 2014.  When they returned, they reported that Taravella had pointed a gun at Appellant.  The four left the

apartment for a second time, and when the women returned, they reported that Appellant had shot and killed the man that pointed the gun at him. When Appellant returned, he admitted to fatally shooting Taravella. Appellant called the apartment later to report that he had hidden the gun in the woods, where it was later found by police. *Id.* at ¶ 3.

II.     Postconviction Petition

{¶5}     While his direct appeal was pending, Appellant filed a *pro se* petition to vacate or set aside judgment of conviction and sentence. He alleged ineffective assistance of counsel based upon a conflict of interest. According to the petition, Appellant's trial counsel coerced him into entering a guilty plea because trial counsel was pursuing a sexual relationship with Appellant's then-girlfriend and mother of his child, Crystal Stewart.

{¶6}     The de hors-the-record evidence attached to the petition included affidavits from Appellant, Stewart, and three of Appellant's friends, Jozelynne Welsh, Sierra Stock, and Ashlie Howard. Howard worked for trial counsel during the pretrial preparation for Appellant's case, and both Welsh and Stock participated to varying degrees in trial counsel's investigation of the crime.

{¶7}     In addition to the affidavits, Appellant attached to the petition Facebook conversations and texts between Stewart and trial counsel. In one exchange, trial counsel wrote that every time Stewart posted on his Facebook page, it made him want to drive to New Castle to see her. She asked if he was inspired by her "overly dramatic posts," and he responded, "That and you're just so cute. For what other reason would I drive in the middle of the night to talk to you?" (Facebook posts, pp. 9-10).

{¶8}     In her affidavit, Stewart provided details of the evening that trial counsel traveled to New Castle to meet with her. Stewart explained that she was uncomfortable meeting with trial counsel alone so she asked him to meet her at the home of Appellant's mother, Millicent Threats ("Mrs. Threats"). When he arrived at 1:30 a.m., trial counsel was intoxicated, and told both women that Appellant should enter into a plea agreement with the state based upon the evidence that would be offered at trial. Stewart did not believe that trial counsel traveled to New Castle at midnight simply to discuss a potential plea deal. (Stewart Aff. ¶ 3).

{¶9}    According to Appellant's affidavit, trial counsel repeatedly asked how he could "get with" Stewart and Welsh. (Appellant Aff. ¶¶ 1-2). Both Appellant and Stewart stated that trial counsel told them that Appellant was not "good enough" for Stewart. (Appellant Aff. ¶ 4, Stewart Aff., ¶¶ 2). Trial counsel told Appellant not to be surprised when he learns while in prison that trial counsel has impregnated Stewart. (Appellant Aff. ¶ 4).

{¶10} Welsh wanted to offer testimony that one man delivered the gun to Appellant at the scene of the crime, and then another hid the gun in the woods after the fatal shooting, but trial counsel refused to offer the evidence at trial. He explained that he represented drug dealers and did not want to represent a "rat." He offered to financially compensate Welsh if he could visit her after seeing a sex video on Appellant's mobile telephone. (Welsh Aff. ¶¶ 1-3).

{¶11} According to Howard, the evidence suggested that Appellant acted in self-defense. Trial counsel constructed a theory of the case for voluntary manslaughter, but then abruptly and inexplicably abandoned it in favor of a plea. Howard also claimed one man delivered the gun to the scene and another man removed it, but trial counsel did not want to implicate anyone other than Appellant in the crime. Howard believed that Appellant was in a panic after Taravella held him at gunpoint and called him a "ni**er." Because Appellant reacted in a rage, Howard believed he should have been convicted of voluntary manslaughter. (Howard Aff.)

{¶12} Stock stated that she was asked by trial counsel to view the Ridgewood Place Apartments security video that captured the shooting to identify the other individuals that were present at the crime scene. The security video was not included in the record on appeal. Stock opined that trial counsel was not interested in the other people involved in the crime and withheld evidence from Appellant. Finally, Stock alleged that inappropriate photographs of her were taken from Appellant's mobile phone and saved on trial counsel's computer. (Stock Aff.) Stock was later employed by trial counsel as a part-time file clerk.

{¶13} Based upon the foregoing evidence, the trial court appointed counsel for Appellant. When briefing on the postconviction petition was complete, the trial court set the matter for an evidentiary hearing.

### III.   Evidentiary Hearing

{¶14} At the evidentiary hearing, the trial court accepted the testimony of Howard, Welsh, Stewart, Appellant and trial counsel.   Howard, Welsh, and Stewart conceded that they were not present the night that Taravella was killed. None of the eyewitnesses to the events leading to Taravella's death testified at the hearing.

{¶15} The testimony provided on Appellant's behalf was offered to establish two alleged facts:  first, no time elapsed between Taravella's threat with the gun and the chase that ended in his fatal shooting; and, second, trial counsel abandoned a valid theory of voluntary manslaughter because of his prurient interest in Stewart.

{¶16} Contrary to the testimony provided by the witness at the preliminary hearing, Appellant testified that he never returned to the apartment before killing Taravella.  After waiving his Fifth Amendment right to remain silent, Appellant provided the following account of the events leading to Taravella's death:

> I went for a walk and a man came at me aggressively and snapped at me, yelling, I snapped back, he then pulled a gun on me as I walked close to him and in the midst of him pulling a gun on me, Kaylee [Parsons], I think that's who it was, [Parsons] called Kim Scott and James Hill came up to me – came up to the top of the hill in the middle of that side road field part and handed me a gun behind my back.

(2/22/16 Postconviction Petition Hrg. Tr. 120).   He continued on cross-examination:

> Well, when [Hill] brought me – when [Hill] brought me the gun, [Taravella] had the gun still pointing at my head and James sat beside me and told him to calm down.  He verbally kept saying that he was about dislike [sic] and that he was going to shoot.  So, when [Hill] slipped the gun in the back of me, I ran at [Taravella], closed. . .

(Tr. 134).   Appellant further explained:

> See, where the Zoo – where the Zoo is at is back here.  The field's right here.  We are next to the road, like literally right next to the road.  So when

he handed me the gun I ran at him.  He went to this side of the building.  I cut around this side and I seen him [sic] and he said, "What did you say to me now, Ni**er?"  And I shot."

(Tr. 135.)  No diagram or map of the area was offered at the hearing.

{¶17}   On cross-examination, the state asked Appellant to explain Taravella's calm demeanor on security video.  According to the observation of the trial court, Taravella walks from behind a side building on the security video and does not appear to be fleeing from anyone.  Appellant responded, "I guess he thought I stopped chasing him but only thing I did was cut to the other side of the building and ended up in front of him." (Tr. 136).

{¶18} In addition to his account of the events leading to Taravella's death, Appellant testified that trial counsel did not undertake any investigation of the crime, and actually mislead Appellant as to the evidence that would be offered at trial.  Appellant testified that trial counsel told him the two women present at the crime scene corroborated his version of the facts. (Tr. 122). Finally, although trial counsel promised to share the evidence furnished by the state during each visit, he never brought any discovery other than the security video for Appellant to review.  (Tr. 124.)

{¶19} Howard, who described her role as trial counsel's "secretary/paralegal," provided testimony regarding his trial preparation.  She conceded that she had no training as a paralegal or any experience working in a law firm prior to her employment with trial counsel.  (Tr. 5-6).

{¶20} Howard testified that trial counsel interviewed Parsons, an eyewitness to the crime; Kimberly Scott, who appears from the record to be the witness who gave testimony at the preliminary hearing; Sierra and Courtney Stock, who identified Hill on the security video, Welsh, and Hill, the second eye-witness. (Tr. 7-9, 23, 75-76). Howard conceded that she did not accompany trial counsel to his interview with Parsons, because Parsons refused to be interviewed if Howard was present.  (Tr. 23.) Howard admitted that she had dated a number of men who were convicted of crimes involving drugs and violence.  She further admitted that she was not present for trial counsel's interview with Scott or the third eyewitness, Tiffany Jenny.  (Tr. 36, 25).

**{¶21}** After interviewing the eyewitnesses, trial counsel explained to Howard that their testimony at trial would directly contradict Appellant's account of the events leading to Taravella's death. Two witnesses would testify that Appellant returned to Briarwood to retrieve the gun and then went to the Ridgewood Apartments to kill Taravella. (Tr. 112). Of equal import, Taravella was unarmed when he was fatally shot. (Tr. 110).

**{¶22}** After Appellant waived his attorney-client privilege, trial counsel provided the following testimony regarding his pretrial preparation. According to Appellant's initial version of the evening's events, a member of the "Nike" gang ran into Scott's house and threw the gun that killed Taravella on the couch. Scott said to get rid of the gun, and Appellant picked it up and "[threw] it." (Tr. 100.) Despite weeks of interviews, trial counsel could not find a single witness who corroborated Appellant's original story. Appellant was the only person who placed the Nike gang member in the apartment. (Tr. 102-103).

**{¶23}** Appellant ultimately admitted to trial counsel that he killed Taravella. Trial counsel conceded that he thought Appellant's second version of the facts constituted voluntary manslaughter, until eyewitness testimony directly contradicted Appellant's story. Trial counsel provided the following summary of Parsons' version of the events leading to Taravella's death:

> That – that [Appellant] – that a gun had been pulled earlier on [Appellant] that day. He was upset. Someone in the group says, you know, "you need – you've got to get even with him. You've got to get even with him." Later on he gets a gun, runs across the parking lot and shoots this Taravella kid in the chest."

(Tr. 79).

**{¶24}** Based upon his interviews with the eyewitnesses and the security video, trial counsel reasoned that Appellant, who had previously been convicted of a felony involving a gun, would likely be convicted of aggravated murder. (Tr. 16, 96). With the firearm specification and the tampering with evidence charge, Appellant faced a maximum sentence of life without parole plus six years. (Tr. 104). Trial counsel admitted telling Appellant that " '[i]n Jefferson County, Ohio you are more than likely

going to have 12 jurors who look like me and don't look like you and you have to take that into consideration, particularly when you're from out of town.' " (Tr. 86.)    For the foregoing reasons, trial counsel encouraged Appellant to enter a plea to the amended charge of murder.  (Tr. 108).

**{¶25}** Trial counsel testified that Appellant was given the state's discovery packet, and was fully apprised of the testimony to be offered at trial by Parsons and Hill. (Tr. 87).  He informed Appellant that it would be very difficult to get a jury instruction on voluntary manslaughter based on the evidence in the case.  At the hearing, trial counsel explained, "I mean, there's not a fight. There's time that's gone by.  You've got a kid [Taravella] standing out in front of a thing that's just standing there."  (Tr. 108).  Finally, trial counsel denied the accusation that he would purposefully omit relevant testimony at trial because he represents drug dealers.  (Tr. 82).

**{¶26}** Stewart testified that she interacted with trial counsel approximately a dozen times, and that he frequently complimented her and told her that she "could do better because [Appellant] wasn't a nice guy." (Tr. 54-55).  When asked if trial counsel ever said anything suggestive or of a sexual nature, Stewart testified that he told Appellant at his plea hearing not to be surprised when he learns in prison that Stewart is pregnant with trial counsel's child.  (Tr. 55.)   Stewart conceded that trial counsel's comments to her were never sexual and he never touched her inappropriately except when he rubbed her shoulders. (Tr. 57-58).

**{¶27}** Stewart told Mrs. Threats that she felt uncomfortable around trial counsel but Mrs. Threats told her to tolerate his behavior because the family had paid him a lot of money for his representation.  Stewart further testified that trial counsel actually drove to New Castle on two occasions, first, to deliver the "evidence packet" for Stewart and Mrs. Threats to review, and second, to discuss the potential plea bargain.  (Tr. 57.)

**{¶28}** Howard, who testified that she worked closely with trial counsel, characterized his statement at the plea hearing that he planned to impregnate Stewart while Appellant was in jail as a "laughing joke."  (Tr. 17.)  She testified that trial counsel merely joked with Appellant about having sex with Stewart.  Howard also conceded at the hearing that the naked photos of Stewart, Sierra Stock, and Welsh on trial counsel's

computer were taken from Appellant's mobile phone and that she was not aware if they were part of the state's discovery. (Tr. 11-12, 30).

{¶29} Trial counsel denied having expressed a sexual interest in any of the women involved in the case, or making any of the lewd comments alleged in the affidavits. He claimed that the explicit pictures on his computer were taken from Appellant's mobile phone and were part of the discovery provided by the state. (Tr. 101). He conceded that his Facebook exchange with Stewart was inappropriate, but explained that he "care[s] about people." (Tr. 82.) He admitted to having a 24-ounce beer with dinner before driving to New Castle to discuss the possible plea deal with Stewart and Mrs. Threats. (Tr. 84).

{¶30} Appellant testified that he did not raise his concerns about trial counsel's sexual interest in the women involved in the case because he was retained and Appellant and his family did not have enough money to retain another attorney. (Tr. 139). However, at his plea hearing, the trial court specifically explained that another attorney would be appointed if, for any reason, Appellant was dissatisfied with trial counsel's representation:

> But even if you couldn't retain your attorney and you ran out of money and had some problem and could not afford a new attorney, that you would still have one because I would appoint you one free of cost to you who would then try the case for free of cost to you [sic]. So, actually at this point you could still go to trial with [trial counsel] or if there was some problem there I would give you an attorney and you could still do either of those. Do you understand that?

(12/12/14 Plea Hrg. 14-15).

{¶31} Prior to accepting Appellant's plea, the trial court asked if there was anything that trial counsel had not done, or if Appellant would have preferred that he had done anything differently, Appellant responded, "No." (Plea Hrg. 18). Appellant stated that he was satisfied with trial counsel's representation.

IV.    Order Overruling the Petition

**{¶32}** The trial court overruled the petition because the testimony offered at the hearing directly contradicted the security video and the statements of the eyewitnesses to the crime, who asserted that Appellant left the scene then returned with a gun and shot Taravella.  The trial court also cited additional inculpatory evidence offered at the hearing that included:  (1) Appellant's DNA on the trigger of the gun and the casings found at the scene of the crime;  (2) gunshot residue on Appellant's shirt, and (3)  the bullets recovered from the scene matched the gun with Appellant's DNA on the trigger. (3/3/16 J.E., pp. 4-5, Tr. 97-98).

**{¶33}** Despite trial counsel's inappropriate exchanges with Stewart and Appellant, the trial court found a lack of evidence demonstrating the alleged conflict of interest.  To the extent that Appellant relied on a 1:00 a.m. visit by trial counsel to Mrs. Threat's home, the trial court recognized that trial counsel visited with both women at that time to discuss a potential plea.  (3/3/16 J.E., p. 3).

**{¶34}** The trial court further found that trial counsel thoroughly investigated all relevant aspects of the crime, insofar as he interviewed everyone present on the night that the crime was committed.  Next, the trial court reasoned that Appellant was aware of trial counsel's alleged misconduct prior to entering his plea, but he stated during the colloquy that he was satisfied with trial counsel's representation.  (3/3/16 J.E., pp. 5-6). Finally, the trial court observed that, even though the victim had pointed a gun at Appellant, there was sufficient time between the victim's threats and his fatal shooting to prohibit the trial court from instructing the jury on voluntary manslaughter.  (3/3/16 J.E., p. 3).

**{¶35}** On June 27, 2016, more than three and a half months after the issuance of the judgment entry on the postconviction petition, counsel for Appellant filed a Civ. R. 60(B) motion asking the trial court to vacate the March 3, 2016 judgment entry, then reissue it, in order to restart Appellant's appeal time.  Counsel explained that he could not locate Appellant after he was moved from the county jail, and, as a consequence, Appellant never received a copy of the judgment entry.  The trial court granted the Civ.R. 60(B) motion and reissued the judgment entry.  However, we *sua sponte* dismissed the appeal based on Ohio Supreme Court precedent that forecloses

appellants from using Civ.R. 60(B) as a substitute for a timely appeal, or as a means to extend the time for perfecting an appeal from the original judgment. *Hamilton v. Spirtos*, 7th Dist. No. 01-C.A.-58, 2002-Ohio-1562, ¶30, citing *Key v. Mitchell*, 81 Ohio St.3d 89, 90-91, 689 N.E.2d 548 (1998).

**{¶36}** On July 24, 2017, counsel for Appellant filed a motion for delayed appeal of the original March 3, 2016 judgment entry. The motion for delayed appeal was overruled on September 8, 2017 because postconviction proceedings are considered quasi-civil in nature, and the Ohio Supreme Court has expressly held that an App.R. 5(A) delayed appeal is not available for an appeal of a post-conviction petition. *State v. Vinson*, 11th Dist. No. 2015-L-018, 2015-Ohio-3549, ¶ 7, citing *State v. Nichols*, 11 Ohio St.3d 40, 42, 463 N.E.2d 375 (1984).

V.     Motion to Withdraw Plea

**{¶37}** On November 7, 2017, Appellant filed the motion to withdraw plea, pursuant to Crim.R. 32.1, that is the subject of this appeal. Appellant alleged that his guilty plea was involuntary because of trial counsel's conflict of interest. In his brief, he relied on the same affidavits attached to his postconviction petition, as well as the transcript of the postconviction petition hearing. On February 6, 2018, the trial court overruled the motion because the allegations "ha[d] already been ruled upon and appealed in previous Post Conviction filings by [Appellant.]" (2/6/18 J.E.) This timely appeal followed.

VI.     Law

**{¶38}** Crim.R. 32.1 provides that a trial court may grant a defendant's post-sentence motion to withdraw a guilty plea only to correct a manifest injustice. *State v. Reed*, 7th Dist. No. 04 MA 236, 2005-Ohio-2925, ¶ 7, citing *State v. Bush*, 96 Ohio St.3d 235, 773 N.E.2d 522, 2002-Ohio-3993, at ¶ 8. "A motion made pursuant to Crim.R. 32.1 is addressed to the sound discretion of the trial court, and the good faith, credibility and weight of the movant's assertions in support of the motion are matters to be resolved by that court." *State v. Smith*, 49 Ohio St.2d 261, 264, 361 N.E.2d 1324, paragraph two of the syllabus (1997). The term "abuse of discretion" connotes more than an error of law or judgment; rather, it implies that the trial court acted in an

unreasonable, arbitrary, or unconscionable manner. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶39}** When, as in this case, the movant seeks to withdraw his guilty plea after the trial court has imposed a sentence, he bears the burden of establishing the existence of a manifest injustice. *Smith*, paragraph one of the syllabus. A defendant can only establish a manifest injustice in "extraordinary cases." *Id.* at 264, 361 N.E.2d 1324. A manifest injustice has been defined by the Supreme Court as a "clear or openly unjust act." *State ex rel. Schneider v. Kreiner* , 83 Ohio St.3d 203, 208, 699 N.E.2d 83 (1998). Manifest injustice has been defined by this court as "an extraordinary and fundamental flaw in the plea proceedings." *State v. Lintner* (Sept. 21, 2001), 7th Dist. No. 732, citing *Smith*, supra.

V.     Analysis

**{¶40}**    Appellant advances three assignments of error in this appeal. Because we address the merits of the motion to withdraw plea without a finding that Appellant's due process rights were violated, Appellant's first assignment of error is moot. As the remaining two assignments of error challenge the trial court's denial of the motion to withdraw plea based on the merits, they will be addressed simultaneously to avoid repetition.

FIRST ASSIGNMENT OF ERROR

The trial court erred in overruling Threats's Motion to Withdraw Plea, and failed to rule on its merits, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

SECOND ASSIGNMENT OF ERROR

Threats was coerced by his trial counsel into pleading guilty to murder, in violation of his Due Process protections under the Fourteenth Amendment to the U.S. Constitution and. Article I, Section § 10 of the Ohio Constitution.

THIRD ASSIGNMENT OF ERROR

A manifest injustice was created when Threats was denied his rights to effective assistance of trial counsel and Due Process, as guaranteed under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article I, Section § 10 of the Ohio Constitution.

**{¶41}** First, the record demonstrates that Appellant was fully informed at the plea hearing of his ability to terminate trial counsel's representation for any reason, as well as his absolute right to court-appointed counsel. Despite this information, Appellant stated at the plea hearing that trial counsel had fulfilled his obligations, and that Appellant was satisfied with his legal representation.

**{¶42}** The record further establishes that Appellant derived a substantial benefit as a result of trial counsel's plea recommendation. Because of the plea agreement, Appellant was able to enter a guilty plea to the lesser charge of murder and avoid a potential aggregate sentence of life without parole plus six years.

**{¶43}** Finally, and of greatest import, trial counsel's plea recommendation was reasonable based upon the virtually insurmountable amount of inculpatory evidence in the record. Despite Appellant's assertion, trial counsel interviewed all of the available eyewitnesses to the events surrounding Taravella's fatal shooting. His investigation revealed that the testimony of each and every eyewitness would contradict Appellant's version of the facts at trial. Appellant's story was not corroborated by any of the individuals present when Taravella pointed a gun at him or when he fatally shot Taravella. Further, the testimony at the hearing provided by non-witnesses Welsh and Howard was based exclusively on hearsay.

**{¶44}** In addition to the eyewitness testimony, the trial court opined that Appellant's version of the facts was directly contradicted by the security video. Although the security video was not included in the record on appeal, trial counsel provided the following description of Taravella's demeanor: "You've got a kid standing out in front of a thing that's just standing there." (Tr. 108). The trial court provided a similar assessment, stating "[t]here's no question that the victim was standing there doing nothing when he was shot." (Tr. 158). Based upon the foregoing observations, the security video was cogent evidence that Taravella was neither in flight, nor in fear for his

life, and, further, that he was not aware he was being stalked by an armed man whom he had mortally threatened earlier that evening.

{¶45} Even assuming arguendo that there is not ample evidence in the record contradicting Appellant's story, his version of the facts leading to Taravella's death is patently unbelievable. In order to demonstrate that no time elapsed between Taravella's threat and his fatal shooting, Appellant asks us to accept a series of utterly implausible events. First, Parsons saw Appellant being held at gunpoint so she called Scott, who by all accounts never left the apartment. Scott called Hill, who was present at the scene. Appellant testified that Hill walked up to Appellant and sat down next to him, despite the fact that Appellant was being held at gunpoint. The foregoing testimony also implies that the heated exchange between Taravella and Appellant occurred while they were seated. Hill tried to diffuse the situation with Taravella, and, at same time, jeopardized his own life by surreptitiously handing a gun to Appellant behind his back. This physical exchange went undetected by Taravella, who, according to Appellant's story, was within arms' length of both men. Despite having a gun pointed at his head, Appellant "ran at" Taravella and gave chase, during which Taravella inexplicably discarded his weapon. Finally, only a few moments after Taravella was able to escape from a man chasing him with a gun, he chose to stand outside of his apartment complex alone and unarmed.

{¶46} In summary, the record demonstrates that Appellant was fully informed of his right to appointed counsel, and was given the opportunity to terminate trial counsel's representation prior to entering his plea. Further, Appellant received a substantial benefit from his plea. Of greatest significance, Appellant's version of the events surrounding Taravella's death, in addition to being inherently unbelievable, would have been contradicted by both testimonial evidence and the security video at trial. Accordingly, we find that the evidence offered in support of the motion to withdraw plea reveals no extraordinary and fundamental flaw in the plea proceedings, and that the trial court did abuse its discretion in overruling the Crim.R. 32.1 motion.

VI. Conclusion

{¶47} For the foregoing reasons, we find that no manifest injustice has occurred in this case, and, as a consequence, Appellant's first assignment of error is moot and

his second and third assignments of error have no merit.  Accordingly, the judgment of the trial court is affirmed, albeit on other grounds.

**Donofrio, J., concurs.**

**Waite, J., concurs.**

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed.  Costs are waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**